UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAVANO MUNNINGS,

                              Plaintiff,

-vs-                                              Case No.  6:07-cv-282-Orl-19KRS

FEDEX GROUND PACKAGE SYSTEMS,
INC.,

                              Defendant.

_____

# ORDER

This case comes before the Court on the following:

1.   Motion for Case-Dispositive Summary Judgment, Statement of Undisputed Material Facts, and Supporting Memorandum of Law by Defendant FedEx Ground Package System, Inc. (Doc. No. 46, filed Dec. 21, 2007);

2.   Appendix to Motion for Case-Dispositive Summary Judgment, Statement of Undisputed Material Facts, and Supporting Memorandum of Law by Defendant (Doc. No. 47, filed Dec. 21, 2007);

3.   Motion to Strike and for Sanctions and Incorporated Memorandum of Law by Plaintiff Javano Munnings (Doc. No. 50, filed Jan. 15, 2008);

4.   Notice of Withdrawal of Two Claims by Plaintiff (Doc. No. 52, filed Jan. 21, 2008);

5.   Notice of Filing Evidence in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment by Plaintiff (Doc. No. 54, filed Jan. 21, 2008);

6.   Verified Response in Opposition to Plaintiff's Motion to Strike and for Sanctions by Defendant (Doc. No. 59, filed Jan. 29, 2008);

7.     Motion to Strike Affidavits and Other Evidence Filed in Opposition to Defendant's Motion for Case-Dispositive Summary Judgment and Supporting Memorandum of Law by Defendant (Doc. No. 60, filed Feb. 7, 2008);

8.     Amended Response to Motion for Summary Judgment by Plaintiff (Doc. No. 68, filed Mar. 27, 2008); and

9.     Amended Response to Defendant's Motion to Strike by Plaintiff (Doc. No. 69, filed Mar. 27, 2008).

## Background

Plaintiff Javano Munnings, a black male, was an independent contractor for Defendant FedEx Ground Package System, Inc. from July 2005 to February 2007.  (Doc. No. 46 at p. 6, *id.* at pp. 7, 18, ¶¶ 3, 32; Doc. No. 68 at pp. 1, 11, ¶¶ 1, 17.)[1] He has brought this action against Defendant for unlawful discrimination and retaliation in violation of 42 U.S.C. § 1981 (2006) and breach of the implied covenant of good faith and fair dealing.  (Doc. No. 2.)

## I.     Material Facts About Which There Is No Dispute

On July 22, 2005, Plaintiff purchased two FedEx Ground delivery routes and two delivery trucks from Troy Hinds.  (Doc. No. 46 at p. 7, ¶ 1; Doc. No. 68 at p. 1, ¶ 1.)  One delivery route was a "primary service area" that serviced the Kennedy Space Center, and the other was a "supplemental route" that serviced Cocoa Beach and Cape Canaveral.  (Doc. No. 46 at p. 7, ¶ 1; Doc. No. 68 at p. 1, ¶ 1.) Plaintiff and Defendant entered into a Pick-Up and Delivery Contractor Operator Agreement

---

[1]     Where, as in Defendant's Motion for Summary Judgment, the numbers printed at the bottom of the page differ from the CM-ECF numbers stamped in the document header, the Court will cite the CM-ECF page numbers.

("the Contract") on July 27, 2005, in which Plaintiff agreed to provide delivery services for Defendant as an independent contractor.  (Doc. No. 78-2 at pp. 2-34; Doc. No. 79-2.)

At all times while Plaintiff was contracted with Defendant, Russell Dezelan, a white male, was the Senior Terminal Manager at the loading facility from which Plaintiff serviced his route. (Doc. No. 46 at p. 8, ¶ 4; Doc. No. 68 at p. 2, ¶ 3.)  Mr. Dezelan was widely regarded as an ineffective terminal manager with poor communication skills.  (Doc. No. 46 at pp. 8-9, ¶¶ 5-6; Doc. No. 68 at p. 2, ¶ 3.)  His employment with Defendant was terminated in May 2007.  (Doc. No. 46 at p. 9, ¶ 6; Doc. No. 68 at p. 12, ¶ 18.)

Second in command at Mr. Dezelan's terminal was the Pick-Up and Delivery ("P&D") Manager, who from June 2006 was Luke Anderson, an Asian male.  (Doc. No. 47-4 at p. 1, ¶ 1.)[2] Also working at the terminal was Troy Hinds, a white male, who worked for Defendant as a Quality Assurance Clerk from January 2006 to May 2006 and from October 2006 to the present.  (Doc. No. 47-3 at p. 5, ¶¶ 9-10.)  Outside of the terminal, Doug Ferguson held the position of Assistant Managing Director for FedEx Ground for the State of Florida until January 2007.  (Doc. No. 47-5 at pp. 2-3, ¶¶ 1-2.) Mr. Dezelan reported to Mr. Ferguson.  (*Id.*)  Also, Vernon Jones was the Senior Manager in the Office of Contractor Relations for the State of Florida.  (Doc. No. 47-9 at p. 2, ¶ 1.)

At the terminal, Defendant would provide "package handlers" or "loaders" in the early morning to load packages onto the contractors' trucks for delivery.  (Doc. No. 46 at p. 10, ¶ 10; Doc. No. 68 at pp. 3-4, ¶¶ 6-7.)  There were serious problems with the pre-load sorting and loading process while Plaintiff was contracted with Defendant, affecting virtually every contractor at the

---

[2]     The CM-ECF stamp, which normally appears in the header of documents, appears in the middle of Defendant's evidentiary documents.  Defendant's counsel are directed to correct this technical error in future filings with this Court.

terminal.  (Doc. No. 46 at p. 10, ¶¶ 10-11; Doc. No. 68 at p. 4, ¶ 7.)  When a package was left behind at the terminal that should have gone out on one of Plaintiff's trucks for delivery, Plaintiff's drivers would often be called back to the terminal to pick up the package.  (Doc. No. 46 at pp. 11-12, ¶¶ 14-16; Doc. No. 68 at pp. 6-8, ¶¶ 11-13.)

During his time working with FedEx, Plaintiff tried to get his supplemental route converted into a primary service area.  (Doc. No. 46 at p. 12, ¶ 17; Doc. No. 68 at pp. 8-10, ¶ 14.)[3]  His supplemental route was finally contracted as a primary service area in September of 2006.  (Doc. No. 46 at p. 12, ¶ 17; Doc. No. 68 at p. 10, ¶ 14.)  Several months later, in February 2007, Plaintiff sold both routes to Stan Brotherton, ending his contractual relationship with Defendant.  (Doc. No. 46 at p. 18, ¶ 32; Doc. No. 68 at p. 11, ¶ 17.)

## II.    Procedural History

In his Verified Complaint, Plaintiff alleges that two of Defendant's employees, Troy Hinds and Russell Dezelan, racially discriminated against Plaintiff by "deliberately sabotag[ing] the scheduling, routing, loading, and other aspects of delivery of packages to Mr. Munnings and his drivers to make the deliveries by Mr. Munnings and his drivers more difficult and stressful, and to induce Mr. Munnings to breach his contract by misdelivering packages." (Doc. No. 2 at p. 2, ¶ 13.)  Further, Plaintiff claims that these actions escalated when Plaintiff complained of the unlawful racial discrimination to Vernon Jones in Defendant's Office of Contractor Relations in 2006.  (*Id.* at p. 4, ¶ 31.)

---

[3]       A supplemental route is created "to assist the main route with covering the work area."  (Doc. No. 54-12 at p. 101.)  Such a route could be converted into a fully contracted "primary service area" which was more profitable and valuable to the contractor.  (*See id.* at pp. 191-96; Doc. No. 54-13 at p. 245.)

Plaintiff brings this action against Defendant alleging: (1) discriminatory impairment of Plaintiff's rights to make and enforce contracts in violation of 42 U.S.C. § 1981; (2) retaliation for complaining about discrimination in violation of 42 U.S.C. § 1981; (3) tortious interference with a prospective contractual relationship; (4) breach of the implied covenant of good faith and fair dealing; and (5) defamation *per se*.  (Doc. No. 2.)  Defendant denies all five counts.  (Doc. No. 13.)

Defendant has filed a Motion for Summary Judgment on all of Plaintiff's claims.  (Doc. No. 46.)  Plaintiff has filed a Response in opposition to Defendant's Motion with respect to Counts I, II, and IV and a Notice of Withdrawal of Counts III and V.  (Doc. Nos. 52, 68.)  Additionally, both parties have filed Motions to Strike portions of the evidence submitted with the Summary Judgment Motion and Response.  (Doc. Nos. 50, 60.)

## Analysis

### I.        Motions to Strike and for Sanctions

Both Plaintiff and Defendant filed Motions to Strike various entries in the record.  (Doc. Nos. 50, 60.)  A motion to strike should be granted only if "the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995) (citing cases). Because this standard is rarely met, "[m]otions to strike are generally disfavored by the Court and are often considered time wasters." *Somerset Pharm., Inc. v. Kimball*, 168 F.R.D. 69, 71 (M.D. Fla 1996).

### A.        Plaintiff's Motion

Plaintiff moves the Court to strike: (1) the Declaration of Carl Howard for improper backdating and lack of relevance; (2) the Declaration of Mike Golda for lack of relevance; (3)

paragraph 8 of the Declaration of Doug Ferguson as contradicting his deposition testimony; and (4)

paragraphs 12 and 13 of the Declaration of Vernon Jones as contradicting his deposition testimony.

(Doc. No. 50.)  Defendant opposes Plaintiff's Motion, explaining that Plaintiff's counsel failed to

fully comply with Local Rule 3.01(g) and also failed to provide a substantive basis for his Motion

to Strike.  (Doc. No. 59.)

Plaintiff argues that the Court should strike the Declarations of Carl Howard and Mike Golda

as irrelevant.  (Doc. No. 50 pp. 1-2, ¶ 3.)  Specifically, Plaintiff states:

> Paragraph 1 of Mr. Howard's Declaration and Paragraph 1 of the Declaration of Mike
> Golda should be stricken because the Declarations parrot each other in stating that
> those men work at FXG's terminal in Cocoa Beach, Florida.  If true, any FXG
> terminal in Cocoa Beach is irrelevant to this case because all of the incidents in this
> case that occurred at FXG terminals were at the FXG terminals in Rockledge and
> Cocoa, and their employment at a Cocoa Beach terminal would negate all other
> averments in their Declarations. . . .  The very fundamental averment of the FXG
> terminal being located in Cocoa Beach, even if in error, strongly indicates the
> underlying unreliability of these Declarations, with the logical inference being that
> these Declarations were presented by out-of-area FXG attorneys for signatures by
> the FXG employees without an opportunity for review and correction by the
> Declarants.

(*Id.*)  Defendant responds by conceding the mistake but explaining that such error was inadvertent.

(Doc. No. 59 at pp. 9-10.)  Defendant states, "FXG does not dispute that its terminal is not located

in Cocoa Beach, FL, but rather in Cocoa, FL, and that there is only one terminal located in Brevard

County, FL. This inconsequential error, however, does not justify invalidating Howard's and

Golda's entire declarations." (*Id.* at p. 9.)  The Court agrees and denies Plaintiff's Motion to strike

the Declarations on this ground.

Plaintiff also asks the Court to strike Mr. Howard's Declaration and impose sanctions on

Defendant and/or its attorneys for backdating the Declaration.  (Doc. No. 50 at pp. 1, 5.)  Plaintiff

explains, "The backdating is apparent because until FXG filed Mr. Howard's Declaration with the

Court, copies of the Declaration had not been dated." (*Id.* at p. 1, ¶ 2.)  Plaintiff specifically seeks

sanctions "under the Court's inherent power . . . ." (*Id.*)

Federal courts have the inherent power to impose sanctions on parties, their lawyers, or both.

*Bank of New York v. Sunshine Jr. Stores, Inc. (In re Sunshine Jr. Stores, Inc.)*, 456 F.3d 1291, 1304

(11th Cir. 2006).  Before a court may impose sanctions under its inherent powers, however, the court

must make a finding of bad faith.  *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1251

(11th Cir. 2007); *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002).  Even

when there is a finding of bad faith, "inherent powers must be exercised with restraint and

discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).  The appellate court reviews a

district court's exercise of its inherent powers for abuse of discretion.  *In re Sunshine Jr. Stores, Inc.*,

456 F.3d at 1304.

Defendant has offered the following explanation for its filing of Mr. Howard's undated

Declaration in its Verified Response:

> In late November, defense counsel contacted Golda and Howard, and interviewed them for the second time in this case.  Defense counsel then typed up declarations summarizing the information that Golda and Howard provided, and forwarded the declarations to Golda and Howard with a request that they read them very carefully, ensure complete accuracy, and contact counsel if they had any changes or concerns, or if they felt that anything in the declarations was incorrect in any way. After having sufficient time to review their declarations and ensure that the information was accurate, Golda forwarded his signed and dated declaration to FXG's counsel on November 29, 2007, and Howard forwarded his signed (but undated) declaration on November 30, 2007.
>
> After defense counsel noticed that Howard's declaration was not dated, FXG's counsel immediately sent the declaration back to Howard for him to review it again, re-confirm its accuracy, and date it.  FXG, however, was unable to obtain a copy of Howard's dated declaration by the end of business on November 30th. Because November 30th was the discovery deadline in this case, FXG forwarded Mike Golda's signed and dated declaration and Howard's signed (but undated) declaration to Munnings as part of a supplemental disclosure.  The following

Monday, December 3, 2007, FXG's counsel received Howard's dated and signed declaration, which it submitted to the Court in support of its Summary Judgment Motion.  Dkt. No. 47 at Tab I.  FXG's counsel has reviewed the contents of the undated and dated versions of Howard's declaration and certifies that they are identical, with the sole exception being that the date was filled in by Howard at some point between November 30 and December 3, 2007.

(Doc. No. 59 at pp. 2-3.)  Defendant concludes, "Thus, Munnings has not shown any conduct by FXG or its counsel that would warrant any sanctions, let alone the ultimate sanction of striking pleadings and assessing costs and attorney's fees against FXG and/or its counsel."  (*Id.* at p. 11.) Plaintiff has offered nothing to rebut these assertions and has not presented any evidence of bad faith on the part of Defendant or its attorneys.  Therefore, the Court will deny Plaintiff's Motion to Strike this testimony and for Sanctions.

Lastly, Plaintiff invokes the "sham affidavit rule" in his Motion to Strike the Declarations of Doug Ferguson and Vernon Jones.  (Doc. No. 50 at pp. 4-5.)  The Eleventh Circuit has explained this rule as follows: "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  As this quotation demonstrates, the rule was intended to prevent the party *opposing summary judgment* from fabricating genuine issues of material fact to avoid summary judgment.  *See id.*  Secondly, a court applying this rule merely disregards the sham affidavit when considering the motion for summary judgment because the contradiction goes to the weight of the evidence rather than its admissibility. *See, e.g.*, *Porterfield v. Flowers Baking Co. of Opelika, L.L.C.*, No. 2:05-cv-937-MEF, 2007 WL 4373006, at *7 (M.D. Ala. Dec. 12, 2007).  Therefore, the Court will disregard, rather than strike,

any statements in the Declarations of Doug Ferguson and Vernon Jones that are inherently inconsistent with the deposition testimony of these witnesses.[4]

### B.    Defendant's Motion

Defendant moves the Court to strike: (1) Plaintiff's Affidavit as contradicting his deposition testimony and including inadmissible evidence; (2) Gary Wolford's Affidavit since Mr. Wolford was not disclosed prior to the discovery deadline; (3) documents referenced in and attached to the Affidavits of Plaintiff and Mrs. Munnings since these materials were not disclosed prior to the discovery deadline; (4) the Affidavit of Selena McNeely as contradicting her deposition testimony; (5) the Affidavit of Alex Rosario as contradicting his deposition testimony; (6) the Affidavit of Ramon Suarez as contradicting his deposition testimony; and (7) the Affidavit of Chris Wilson as contradicting his deposition testimony.  (Doc. No. 60.)  Plaintiff has filed a Response opposing Defendant's Motion.  (Doc. No. 69.)

Defendant's arguments that the contradictory statements in the Affidavits of Plaintiff, Ms. McNeely, Mr. Rosario, Mr. Suarez, and Mr. Wilson should be striken invoke the "sham affidavit rule" discussed previously.  (*See* Doc. No. 60 at pp. 6-9.)  The Court will disregard, rather than strike, the statements of these witnesses in their Affidavits that are inherently inconsistent with their deposition testimony.  Furthermore, the Court will apply the Federal Rules of Evidence to these Affidavits and will exclude from its consideration those statements that violate such Rules.

---

[4]    In its Response, Defendant claims that Plaintiff's Motion was frivolous and seeks an award of reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1927.  (Doc. No. 59 at pp. 11-12.)  The Court does not find Plaintiff's Motion to be frivolous and accordingly denies Defendant's request.

Defendant also moves to strike the Affidavit of Mr. Wolford and the attachments to the Affidavits of Plaintiff and Mrs. Munnings on the ground that such evidence was not disclosed during discovery.  (Doc. No. 60 at pp. 3-6.)  Federal Rule of Civil Procedure 26 imposes on a party the duty to disclose, among other things, the names of all individuals "likely to have discoverable information" as well as all documents "that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses" to the opposing party.  Fed. R. Civ. P. 26(a)(1)(A).  A party also has a duty to supplement or correct its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made know to the other parties during the discovery process or in writing . . . ."  *Id.* at R. 26(e)(1)(A).  A party does not have to disclose such evidence only if the evidence is intended for use "solely for impeachment."  *Id.*  If a party fails to provide evidence or identify a witness as required by Rule 26(a) or (e), Rule 37 provides that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  *Id.* at R. 37(c)(1).

The Eleventh Circuit considers three factors when reviewing a district court's decision to exclude previously undisclosed evidence under Rule 37: (1) the importance of the evidence; (2) the reason for the party's failure to disclose the evidence earlier; and (3) the prejudice to the opposing party if the evidence is considered.  *Bearint ex rel. Bearint v. Dorel Juvenile Group, Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004); *Cooley v. Great S. Wood Preserving*, 138 F. App'x 149, 160-61 (11th Cir. 2005).  The Court considers each factor in turn for the three contested documents.

### 1.      Affidavit of Gary Wolford

The Affidavit of Gary Wolford, a customer of Defendant on Plaintiff's route, contains four paragraphs detailing an incident in which Mr. Wolford called FedEx to find out why a package he was expecting to receive had been delayed.  (Doc. No. 54-5 at p. 1, ¶ 3.)  He allegedly spoke to Troy Hinds, who transferred him to a" manager . . . named Russ."  (*Id.*)  According to Mr. Wolford, Russ told him that "the problem was caused by the route contractor, Javano Munnings" and encouraged him to "make a complaint against Mr. Munnings."  (*Id.*)  Further, Mr. Wolford stated, "Russ' statements to me seemed to be a rather personal attack against Mr. Munnings."  (*Id.* at p. 2, ¶ 4.)  This Affidavit offers evidence that Mr. Dezelan manipulated the customer complaint process to ensure Mr. Munnings received formal complaints against him and could be "important" evidence of racial discrimination.   Thus, the first factor weighs in favor of considering Mr. Wolford's Affidavit.

Plaintiff offers two reasons for failing to disclose Mr. Wolford as a person with discoverable information under Rule 26.  First, Plaintiff states that "neither Mr. Munnings nor undersigned Counsel knew that Mr. Wolford had information relevant to the case until after FXG had filed its motion for summary judgment on December 21, 2007, essentially denying that Dezelan fabricated complaints."  (Doc. No. 69 at p. 2.)  Plaintiff continues:

> Here, the information known by Mr. Wolford presumably has been known by FXG all along because he is an FXG customer whose business is (and has been) located on what used to be Mr. Munnings' route; and, as Mr. Wolford testified, FXG's manager attempted to incite him to complain about Mr. Munnings when Mr. Wolford contacted FXG's terminal merely to track a package–something FXG presumably always knew and something Mr. Munnings did not know until Mr. Wolford was contacted in Mr. Munnings['] researching of his previous customers in an attempt to gather evidence to rebut the false assertions made in FXG's summary judgment motion. Thus, FXG–not Mr. Munnings–is delinquent in disclosing Mr. Wolford; and, for this reason alone, the supposed non-disclosure of Mr. Wolford is harmless to

> FXG, while Mr. Munnings is substantially justified in using Mr. Wolford's testimony
> that is newly discovered by Mr. Munnings.

(*Id.* at pp. 3-4.)  Second, Plaintiff asserts that Mr. Wolford's testimony is intended for impeachment only and therefore is not subject to disclosure.  (*Id.* at p. 4.)

Plaintiff's justifications for failing to disclose this witness in a timely manner are not availing.  Regarding Plaintiff's first argument, Plaintiff does not allege that he did not know Mr. Wolford's identity prior to Defendant's Motion for Summary Judgment; he instead states that he simply did not know what Mr. Wolford would say until he asked him.  Such a belated investigation after the close of discovery to find new evidence to oppose a summary judgment motion does not provide good cause for admitting such evidence.  Plaintiff's second argument that this evidence was intended only for purposes of impeachment is not well taken, as Plaintiff appears to equate rebuttal evidence with impeachment evidence.  Rebuttal evidence tends to disprove a fact asserted by the other side while impeachment evidence goes to the credibility of a witness.  Black's Law Dictionary 597, 599 (8th ed. 2004).  Mr. Wolford's testimony would constitute rebuttal, rather than impeachment, evidence.  Furthermore, impeachment evidence is entirely irrelevant at the Summary Judgment stage because it goes to the credibility of a witness.  The second factor therefore weighs against its consideration.

Finally, Defendant would likely suffer unfair prejudice if this evidence is considered.  Defendant was not able to depose this witness since Mr. Wolford was identified after the close of discovery.  Despite Plaintiff's arguments to the contrary, the Court will not impute knowledge to Defendant of Mr. Wolford's testimony.  (*See* Doc. No. 69 at pp. 4-5.)  Further, since Plaintiff has opposed Defendant's Motion to stay or for a continuance, Plaintiff is apparently unwilling to give Defendant an opportunity to depose Mr. Wolford.  (*See* Doc. Nos. 75-76.)

Two of the three factors weigh against considering this evidence; therefore, the Court strikes the Affidavit of Gary Wolford from the record pursuant to Federal Rule of Civil Procedure 37.

## 2.      Settlement Statements

Plaintiff included with his Affidavit copies of his settlement statements from April to September of 2006. (Doc. No. 54-3 at pp. 14-35.) These settlement statements show the volume of packages picked up and delivered on Plaintiff's then-supplemental route for these months. (*Id.*) Plaintiff uses these statements to contest the validity of Defendant's evidence of a legitimate, non-discriminatory reason for the delay in converting Plaintiff's supplemental route to a primary service area: that Plaintiff's package volume did not warrant the conversion. (*Id.* at pp. 7-8, ¶ 27.) These settlement statements, when viewed in the light most favorable to Plaintiff, could constitute important circumstantial evidence of race discrimination. Therefore, the first factor weighs in favor of considering these statements.

To explain his failure to previously disclose this evidence, Plaintiff contends that "only when FXG filed and served the false and misleading [package volume] figures [of Plaintiff's white co-workers whose routes were converted] did the FXG settlement statements regarding Mr. Munnings' package volume for the specified time period become relevant." (Doc. No. 69 at p. 6.)[5] This contention is unavailing, however, because the standard for relevance is extremely low. *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Certainly Plaintiff could have foreseen that the package volume

---

[5]      Plaintiff further argues that such evidence is not subject to disclosure as it is intended for impeachment purposes only. (Doc. No. 69 at pp. 6-7.) For the reasons stated in the previous note, this argument is without merit.

for the route he claims Defendant failed to convert for discriminatory reasons would be relevant to his claim, as it goes directly to the similarly situated comparator inquiry. *See* Section II.B.1, *infra*. Thus, the second factor weighs against consideration of the settlement statements.

Lastly, Defendant concedes that these statements are from its own records. (Doc. No. 60 at pp. 5-6 n. 3.) Nevertheless, Defendant denies the failure to disclose such statements is harmless because Defendant "has thousands of documents that may pertain to Munnings and to his routes," and Defendant "should not be left to guess at which documents in Munnings' possession, which were specifically requested but not disclosed during discovery, may be used in opposition to summary judgment or at trial." (*Id.*) However, in support of its Motion for Summary Judgment, Defendant attached the Declaration of Luke Anderson, the P & D Manager at Defendant's Cocoa, FL terminal. (Doc. No. 47-4.) Mr. Anderson indicated he had reviewed "the records regarding other contractors who had routes approved around the same time as Munnings" and further detailed Plaintiff's package volume figures for the relevant time. (*Id.* at pp. 11-12, ¶ 33.) This belies Defendant's claim that it is prejudiced by Plaintiff's introduction of the settlement statements. Since Defendant apparently had access to this information and even submitted comparative evidence against Plaintiff, Defendant will not be prejudiced by consideration of the settlement statements attached to Plaintiff's Affidavit.

Two of the three factors weigh in favor of consideration; therefore, Defendant's Motion to Strike the settlement statements is denied.

### 3.    Bill of Sale

Plaintiff has included the Bill of Sale for the route "known and commonly referred to as Merritt Island Mall" with the Affidavit of Mrs. Natasha Munnings, Plaintiff's wife. (Doc. No. 54-4 at p. 6.) This shows that "Javano Munnings and Gary Lanz executed the purchase agreement on

August 8th, 2005." (*Id.* at p. 2, ¶ 5.)  The fact of the purchase has not been contested by Defendant, and Plaintiff uses Mr. Dezelan's recommendation to make this purchase as evidence of discrimination rather than the purchase agreement itself.  (*See* Doc. No. 68 at p. 9, ¶ 14.)  Thus, this does not constitute "important" evidence of discrimination and weighs against consideration.

Second, Plaintiff explains that "the failure for the late disclosure (sic) was substantially justifiable because Mr. Munnings mistakenly thought he had lost the bill of sale, thereby rendering the failure inadvertent." (Doc. No. 69 at p. 8.)  Giving Plaintiff the benefit of the doubt, the Court finds this failure to disclose justifiable and concludes that the second factor weighs in favor of consideration of this evidence.

Finally, Defendant has not offered any explanation as to what prejudice it would suffer if the Court were to consider this evidence.  (*See* Doc. No. 60 at pp. 5-6.)  Since the document in question provides direct evidence of the purchase of a particular route, which is an uncontested fact, the Court finds that Defendant will not suffer any prejudice if the bill of sale is considered.

Therefore, with two factors weighing in favor of consideration, the Court denies Defendant's Motion to Strike the bill of sale.[6]

## II.     Defendant's Motion for Summary Judgment

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

---

[6]      Defendant seeks an award of attorneys' fees and costs for having to bring its Motion to Strike, "particularly in light of the distressing fact that the Affidavits, consisting almost entirely of inadmissible statements, were drafted and/or submitted by Munnings' counsel, and not a lay person." (Doc. No. 60 at p. 17.)  Even assuming this is true, Defendant has not demonstrated bad faith warranting such sanctions; therefore, Defendant's Motion for attorneys' fees and costs is denied.

that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## A.      Withdrawn Claims

Defendant moves for summary judgment on all of Plaintiff's claims.  (Doc. No. 46 at pp. 6-7.)  Plaintiff does not offer any opposition to Defendant's arguments for summary judgment on Count III, tortious interference with a prospective contractual relationship, and Count V, defamation *per se*.  (*See* Doc. No. 68.)  Instead, Plaintiff has filed a Notice of Withdrawal of these two claims because "key witnesses have recanted their statements regarding [these] claims."  (Doc. No. 52 at p. 1.)  In its Motion to Stay, Defendant notes in response:

> Plaintiff's Complaint also asserts claims of tortious interference with a prospective contractual relationship, and defamation.  Dkt. No. 2.  On January 21, 2008, Plaintiff filed his Notice of Withdrawal of those two claims.  Dkt. No. 52.  While FXG does not oppose the dismissal of those claims with prejudice, no order of dismissal has been entered by the Court to date.  Although the undersigned counsel notified Plaintiff's counsel that the purported withdrawal failed to comply with the requirements of Fed. R. Civ. P. 41(a), Plaintiff has yet to correct the procedural error and file the appropriate documents.

(Doc. No. 67 at p. 2, n. 1.)  Plaintiff has not presented to the Court any response to this argument.

Under Federal Rule of Civil Procedure 41, a plaintiff may file a notice of dismissal of a claim "before the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(i).  If a plaintiff does not file a notice of dismissal as provided in this subsection, then a claim may be voluntarily dismissed either by a "stipulation of dismissal signed by all parties" or by "court order, on terms that the court considers proper."  *Id.* at R. 41(a)(1)(A)(ii), 41(a)(2).

The Court construes Plaintiff's Notice of Withdrawal as a Motion for Voluntary Dismissal of Counts III and V of the Complaint.  (Doc. No. 52.)  Since the dispositive motions deadline has passed, Defendant has moved for summary judgment on all counts, and Plaintiff has not come forward with any evidence to support these two claims, the Court finds that it is proper to dismiss Counts III and V with prejudice.

### B.    Count I: Discrimination

In his first Count, Plaintiff alleges that Defendant racially discriminated against him and violated his rights under Section 1981 to make and enforce contracts. (Doc. No. 2 at pp. 1-4, ¶¶ 1-29.)  Section 1981 provides:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (2006).  The elements of a claim of race discrimination under Section 1981 are: (1) that the plaintiff is a member of a protected class; (2) that the defendant intended to discriminate against the plaintiff on that basis; and (3) that the defendant's racially discriminatory conduct abridged a right enumerated in the statute.  *E.g.*, *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007).

For purposes of its Summary Judgment Motion, Defendant does not dispute that Plaintiff has established the first element of his Section 1981 claim. (Doc. No. 46 at p. 20.)  Defendant does, however, argue that Plaintiff has failed to demonstrate the second and third elements of his claim.

(*Id.* at pp. 20-24.)  Plaintiff responds that he has produced evidence that raises genuine issues of material fact as to both of these elements.  (Doc. No. 68 at pp. 12-16.)  The Court first considers whether Plaintiff has raised a genuine issue of material fact that Defendant abridged one of his contractual rights and then whether Plaintiff has raised a genuine issue of material fact that Defendant intended to discriminate against him.[7]

## 1.    Third Element: Abridgement of a Contractual Right

To establish the third element of a Section 1981 claim, a plaintiff must prove that the defendant failed to perform a contractual obligation.  *E.g.*, *Benton*, 230 F. Supp. 2d at 1369.  In other words, the plaintiff must produce evidence demonstrating that the defendant acted to deprive him of benefits to which he was entitled under the contract.  *Id.* at 1371.  The Court therefore will first look to the contract to determine which provisions Plaintiff claims have been violated by Defendant's actions.  Next, the Court will decide which of Defendant's employees may create liability for Defendant.  Lastly, the Court will consider which particular actions may properly be considered impairments of Plaintiff's contractual rights.

### a.    Relevant Contractual Provisions

The Contract includes several provisions which indicate that the parties expected Defendant to provide adequate loading service and package volume for its contractors:

> FedEx Ground wants to provide for package pick-up and delivery services through a network of independent contractors, and, subject to the number of packages tendered to FedEx Ground for shipment, will seek to manage its business so that it

---

[7]     This analysis takes the two elements out of order.  However, as explained by Judge Carnes in the Northern District of Georgia: "[T]he plaintiff must show that the defendants actually did something wrong before she can call on a court to gauge whether there was an racial motivation behind their actions."  *Benton v. Cousins Props., Inc.*, 230 F. Supp. 2d 1351, 1371 (N.D. Ga. 2002).

> can provide sufficient volume of packages to Contractor to make full use of
> Contractor's equipment. . . . [T]his Agreement will set forth the mutual business
> objectives of the two parties intended to be served by this Agreement . . . .

(Doc. No. 78-2 at p. 6; Doc. No. 79-2 at p. 5.)  This provision suggests the parties would both work

to run an efficient and productive package delivery operation.  This goal was stated more explicitly

in another provision:

> This Agreement is based on the concept that Contractor and FedEx Ground are each
> engaged in an undertaking to operate an efficient package delivery service which is
> fully competitive with the standards of other national participants in the industry.
> FedEx Ground and Contractor recognize that, because of the reciprocal benefits
> which flow from participation in an interrelated, national service, they have a mutual
> interest in increasing package volume and the number of customers both in
> Contractor's Primary Service Area and in the service areas of other contractors who
> have entered into substantially identical agreements with FedEx Ground. . . . [T]his
> Agreement contemplates the recognition both by the parties hereto and by other
> contractors in the FedEx Ground system of a proprietary interest by Contractor in the
> customer accounts in his/her Primary Service Area . . . .

(Doc. No. 78-2 at p. 22; Doc. No. 79-2 at p. 21.)

The Contract also includes several provisions concerning expected payments.  For instance,

the Contract provides: "FedEx Ground agrees to settle on a weekly basis with Contractor for services

provided in accordance with the settlement schedule . . . ."  (Doc. No. 78-2 at p. 18; Doc. No. 79-2

at p. 17.)  This weekly "settlement" was  "payment for stops made and packages handled."  (Doc.

No. 78-2 at p. 19; Doc. No. 79-2 at p. 18.)  A weekly service bonus would also be paid to every

contractor who had no missed pickups.  (Doc. No. 78-2 at p. 51; Doc. No. 79-12 at p. 2.)

Additionally, the Contract contemplated additional performance-based payments for which a

contractor was eligible after his first year.  (Doc. No. 78-2 at pp. 20, 24; Doc. No. 79-2 at pp. 19,

23.)  To qualify for a contractor customer service program bonus, the contractor must have, among

other things, no verified customer complaints during the applicable accounting period.  (Doc. No.

78-2 at p. 50; Doc. No. 79-12 at p. 1.)

### b.        Relevant Actors

Plaintiff claims that he was discriminated against by two of Defendant's employees: Russell

Dezelan and Troy Hinds.  (Doc. No. 54-12 at pp. 336-39.)[8]  A corporate defendant may be liable for

the discriminatory actions of its employees under two theories.  *E.g.*, *Vance v. S. Bell Tel. & Tel.*

*Co.*, 863 F.2d 1503, 1512 (11th Cir. 1981), *overruled on other grounds by Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 22 (1993);  *Martinez v. Pavex Corp.*, 422 F. Supp. 2d 1284, 1294-95 (M.D. Fla.

2006).   Under the first theory, a corporate defendant is vicariously liable for the conduct of its

agents[9] acting within the scope of their authority.  *Vance*, 863 F.2d at 1514-15; *Martinez*, 422 F.

Supp. 2d at 1294-95; *see also Alexander v. Fulton County*, 207 F.3d 1303, 1334 (11th Cir. 2000).

Under the second theory, a corporate defendant is liable under the principle of *respondeat superior*

for an employee's discriminatory actions if the corporate management knew or should have known

of the discriminatory action and failed to prevent further discrimination or take prompt remedial

action.  *Vance*, 863 F.2d at 1512-14; *Martinez*, 422 F. Supp. 2d at 1295.

---

[8]        As with all citations to the electronic record, the page numbers cited here are the
CM-ECF stamped page numbers in the header of the document rather than the
transcript numbers appearing within the document.

[9]        The Restatement (Third) of Agency defines "agency" as "the fiduciary relationship
that arises when one person (a 'principal') manifests assent to another person (an
'agent') that the agent shall act on the principal's behalf and subject to the principal's
control, and the agent manifests assent or otherwise consents so to act."  Restatement
(Third) Agency § 1.01.  The comments to this section explain that the common law
definition of agency encompasses the employment relationship.  *Id.* cmt. c.

### i.     Russell Dezelan

The majority of Plaintiff's factual allegations involve the actions of Russell Dezelan, the Senior Terminal Manager in Brevard County.  (Doc. No. 46 at p. 8, ¶ 4; Doc. No. 68 at p. 2, ¶ 3.)  Though the specifics of Mr. Dezelan's job responsibilities are unclear, the record shows that Mr. Dezelan was generally responsible for working with the FedEx contractors to ensure that their trucks were loaded and packages properly delivered.  (Doc. No. 46 at pp. 8-12, ¶¶ 4-6, 8-10, 12-14; Doc. No. 54-12 at p. 121; Doc. No. 68 at pp. 2, 4-11, ¶¶ 3-4, 7-8, 10-16.)  Mr. Dezelan also was responsible for investigating customer complaints against contractors.  (Doc. No. 47-4 at pp. 2-3, ¶ 6.)  Therefore, Mr. Dezelan was acting as an agent of Defendant when performing his job as Senior Terminal Manager.[10]  Accordingly, the Court will consider whether Mr. Dezelan's actions impaired Plaintiff's contractual rights.

### ii.     Troy Hinds

Plaintiff also claims that he was discriminated against by Troy Hinds who worked as a Quality Assurance Clerk for Defendant from approximately January 2006 to May 2006, and again from October 2006 to the present.  (Doc. No. 47-3 at p. 4, ¶¶ 9-10.)  In his Declaration, Mr. Hinds described his employment duties as follows: "I am responsible for making address corrections and performing package damage inspections with addresses."  (*Id.* at p. 4, ¶ 10.)  He continued, "If a package is left behind at the terminal, I look to determine whether it has the correct address and whether it needs to be repacked."  (*Id.* at p. 6, ¶ 15.)  Plaintiff has testified that Mr. Hinds was in a position to affect his business.  (Doc. No. 54-12 at pp. 319-20.)  Since Plaintiff alleged that Mr. Hinds was discriminatory in carrying out the tasks assigned to him by Defendant, Defendant is liable

---

[10]     Defendant does not dispute this in its Motion.  (*See* Doc. No. 46 at p. 8, ¶ 5.)

to Plaintiff under an agency theory of vicarious liability for discriminatory actions Mr. Hinds took

within the scope of his employment that impaired Plaintiff's contractual rights.[11]

### c.    Alleged Impairments

### i.    Actions of Russell Dezelan

Plaintiff has produced evidence that Mr. Dezelan's actions impaired his contractual right to

operate an efficient package delivery service and maximize his benefits under the contract.  For

instance, according to Plaintiff, Mr. Dezelan either did not assign Plaintiff a loader or assigned the

worst loader to Plaintiff.[12]   As Plaintiff stated in his deposition: "Amongst other complaints

pertaining to loading, the main ones I had were either that I did not have a loader, I didn't have a

loader available to load my truck or a loader that was knowledgeable of my trucks to load them."

(Doc. No. 54-13 at p. 131.)   Though Plaintiff recognized that white contractors had loading

problems, he explained, "None had the same issues that I had."  (*Id.* at p. 133.)   Further, when

Plaintiff asked Mr. Dezelan for assistance with loading, Mr. Dezelan would ignore him and instead

assist white contractors.  (*Id.* at pp. 180-81; Doc. No. 54-12 at pp. 307-311.)   Once a loader was

assigned to Plaintiff's truck and learned how to properly load the truck, "he was removed and placed

on someone else's truck and a less experienced loader was then placed on my truck, which did not

---

[11]    The evidence suggests that Mr. Hinds did not have a supervisory role at the terminal over FedEx employees or independent contractors.  (*E.g.*, Doc. No. 47-3 at p. 5, ¶ 10.)  Thus, Mr. Hinds is an agent of Defendant only when performing those duties assigned to him by Defendant, and Defendant is liable for any discriminatory actions Mr. Hinds took in the performance of his assigned duties.  *See, e.g.*, Restatement (Third) Agency §§ 7.04, 7.07.

[12]    The parties have presented conflicting evidence as to Mr. Dezelan's involvement with the assignment of loaders to contractors.  (*Compare, e.g.*, Doc. No. 47-4 at p. 8, ¶ 26 *with* Doc. No. 54-10 at p. 2, ¶ 10.)  The Court may not resolve this factual issue on summary judgment but must view the evidence in the light most favorable to Plaintiff.  *See Anderson*, 477 U.S. at 255.

allow smooth delivery dates for me." (Doc. No. 54-13 at p. 367.) The loader most frequently assigned to Plaintiff's trucks was "Sloppy Joe," who was "one of the most inadequate loaders." (Doc. No. 54-12 at p. 359.) Such loading inadequacies would delay Plaintiff's drivers and affect their ability to make all their deliveries on time. (Doc. No. 54-13 at pp. 151-55.)

Additionally, Plaintiff testified that his packages were frequently mishandled by the loaders. (*Id.* at pp. 193-201.) Plaintiff's drivers were called back for left-behind packages far more frequently than other drivers. (*Id.*) When this happened, the appropriate procedure was to scan the package as a terminal failure. (Doc. No. 54-16 at p. 81.) The left-behind package then "sits there until it gets delivered either the next day by the driver that it belongs to or management will–is supposed to deliver them themselves, not take them to the drivers." (*Id.* at p. 84.) However, when one of Plaintiff's packages was left behind, Mr. Dezelan would depart from normal procedure and would call Plaintiff's driver and have him return to the terminal to pick the package up, further delaying deliveries. (Doc. No. 54-13 at pp. 193-201; Doc. No. 54-19 at p. 121.)

Plaintiff has also produced evidence that Mr. Dezelan interfered with his ability to earn customer service bonuses. It was Plaintiff's perception that Mr. Dezelan handled most of the customer complaints against Plaintiff's drivers and that Mr. Dezelan inflated the complaints to ensure that they became formal customer complaints. (Doc. No. 54-3 at pp. 3-4, 12, ¶¶ 11, 41; Doc. No. 54-12 at pp. 374-75.) Mr. Dezelan himself admitted that he was the one who decided whether a customer complaint was valid or invalid. (Doc. No. 54-23 at p. 7.)

Furthermore, during a peak season, Mr. Dezelan prevented Plaintiff from delivering packages on Saturdays. (Doc. No. 54-16 at pp. 112-13.) Plaintiff's drivers normally delivered on Saturdays, but on one particular day, Mr. Dezelan told the contractors that only three drivers would

be permitted to deliver on Saturdays.  (*Id.* at p. 113.)  Mr. Dezelan then selected three white contractors to do the Saturday deliveries and not Plaintiff.  (*Id.*; Doc. No. 54-20 at pp. 185-87, 195-97.)

Finally, Plaintiff has testified that Mr. Dezelan repeatedly threatened to have Plaintiff's contract terminated and delayed recommending the conversion of Plaintiff's supplemental route to a primary service area.  (Doc. No. 54-12 at pp. 181, 191, 231-32, 313-14.)  He encouraged Plaintiff to make a bad business decision and purchase stops at Merritt Square Mall, purporting to help Plaintiff get his supplemental route converted.  (Doc. No. 54-13 at pp. 81-82, 91-94.)  Plaintiff also claims that Mr. Dezelan failed to pass on his route conversion request and relevant materials to the corporate office even though Mr. Dezelan said he had submitted such materials.  (Doc. No. 54-3 at p. 2, 10, ¶¶ 6-7, 37.)

This evidence, if believed by a jury, shows instances of Mr. Dezelan impairing Plaintiff's right to enjoy the contractual benefits of running an efficient delivery service, maximizing his profits, and receiving customer service bonuses.  Thus, Plaintiff has raised a genuine issue of material fact that the actions of Russ Dezelan impaired his rights under the Contract and his right to enter into a new primary service area contract.

### ii.      Actions of Troy Hinds

Plaintiff has offered evidence that Troy Hinds also interfered with his contractual right to compensation for properly delivered packages and customer service bonuses.  For example, Plaintiff testified that Mr. Hinds, who managed left-behind packages, would improperly scan his packages to reflect a driver error rather than a loader error with much greater frequency than he would the packages of white contractors.  (Doc. No. 54-12 at pp. 319-23; Doc. No. 54-13 at pp. 287-90; Doc.

No. 54-16 at pp. 43, 63-73; Doc. No. 54-18 at pp. 73-74; Doc. No. 54-20 at p. 121.)  A jury could

infer from the disparity in such errors that Mr. Hinds' actions were intentional.

Such improper scanning penalizes Plaintiff because, according to Plaintiff, "If I intentionally

leave packages behind, I receive a code which is issued by the terminal, which means that I

intentionally left the packages behind.  It goes against my service, it goes against my bonuses that

I would get from Fedex and lowers my reputation as a contractor."  (Doc. No. 54-12 at pp. 322-23;

*see also* Doc. No. 54-13 at pp. 289-90.)   Thus, if Mr. Hinds intentionally scanned Plaintiff's

packages improperly, such conduct would constitute impairment of Plaintiff's contractual rights

because it adversely affects Plaintiff's weekly settlement and bonus.   Accordingly, Plaintiff has

raised a genuine issue of material fact that the actions of Troy Hinds impaired his rights under the

Contract.

The Court must now consider whether the actions of either Mr. Dezelan or Mr. Hinds

constitute intentional racial discrimination.

### 2. Second Element: Intentional Discrimination

#### a. Classification of the Evidence Submitted By Plaintiff

A plaintiff may prove the second element of his 1981 claim through either direct or

circumstantial evidence.  *E.g.*, *Kinnon*, 490 F.3d at 891-93; *Bass v. Bd. of County Comm'rs*, 256 F.3d

1095, 1105 (11th Cir. 2001).   Direct evidence of discrimination is evidence which, if believed,

would prove the existence of a fact in issue without inference or presumption.  *Bass*, 256 F.3d at

1105; *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990).   Only the most blatant

remarks, the intent of which could be nothing other than to discriminate on the basis of race,

constitute direct evidence of discrimination.   *Bass*, 256 F.3d at 1105; *Damon v. Fleming*

*Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir.1999).  For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision and related to that particular decision.  *Bass*, 256 F.3d at 1105; *Trotter v. Bd. of Trustees*, 91 F.3d 1449, 1453-54 (11th Cir.1996), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).  Remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.  *Bass*, 256 F.3d at 1105; *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).  If the plaintiff's evidence is subject to more than one interpretation or suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).

In its Motion for Summary Judgment, Defendant asserts that Plaintiff has offered no direct evidence of discrimination.  (Doc. No. 46 at pp. 18-19 & n. 5.)  Specifically, Defendant states:

> Munnings may attempt to argue that certain comments by Dezelan and Hinds constitute direct evidence in this case.  Specifically, Munnings testified that he heard Hinds use the word "nigger" in his presence, but could not recall ever reporting it to Contractor Relations or to any FXG managers, . . . .  While Munnings never heard Dezelan use that word, he did testify that at some unspecified time, Dezelan referred to him as "you blacks, you people" during a heated argument with Munnings by telephone, and made other comments that did not reference his race, but that Munnings felt "implied" his race. . . .  Even if taken as true, neither of these statements constitutes direct evidence of discrimination . . . .  First, as to Hinds, it is undisputed that he was not, and never has been, a manager with decisionmaking authority over Munnings and/or his contract. . . .  Further, Munnings was unable to provide a temporal context for the alleged statement by Dezelan.  At best, this comment, which was not linked to any tangible decisions with respect to Munnings' contract, constitutes a "stray remark" that cannot be used as direct evidence.

(*Id.* at p. 19, n. 5 (internal citations omitted).)  Plaintiff does not directly address this argument in his Response but does include an analysis of pretext, in which he states, "[Plaintiff's] prima facie evidence . . . refutes [Defendant's] proffered excuses as pretexts."  (Doc. No. 68 at pp. 17-19.)  This

indicates that Plaintiff is proceeding under a circumstantial evidence theory, and Plaintiff has not offered any evidence that suggests otherwise.  Therefore, the Court will analyze Plaintiff's claims using the rules applicable to circumstantial evidence cases.

### b.      Analysis of the Circumstantial Evidence

Section 1981 race discrimination claims premised on circumstantial evidence are analyzed under the burden shifting rules articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) for cases brought under Title VII.  *E.g.*, *Howard v. BP Oil, Inc.*, 32 F.3d 520, 524 n. 2 (11th Cir. 1994).  Under the *McDonnell Douglas* burden shifting framework, a plaintiff alleging discriminatory treatment must first establish a *prima facie* case of unlawful discrimination.  *E.g.*, *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).  Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production but not of persuasion shifts to the defendant to produce "legitimate, non-discriminatory reasons for its [challenged] action[s]."  *Joe's Stone Crab, Inc.*, 220 F.3d at 1286 (internal quotation marks and citations omitted).  "If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination."  *Id.*  The United States Supreme Court has offered some further guidance about proof of pretext:"[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)); *see also Walker v. Mortham*, 158 F.3d 1177, 1183-85 & n. 10 (11th Cir. 1998).

### c.      Prima Facie Case[13]

### i.      Appropriate Test

As observed by Judge Story in the Northern District of Georgia, "While courts have had little difficulty determining that the *McDonnell Douglas* burden-shifting test is the appropriate one, [c]ourts have struggled with the appropriate elements of a *prima facie* case to apply in the context of § 1981 claims." *Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342, 1353 (N.D. Ga. 2005). The Eleventh Circuit has applied the standard Title VII *prima facie* elements to Section 1981 claims of discrimination in employment. *E.g.*, *Howard*, 32 F.3d at 524 n. 2. However, the Eleventh Circuit has not yet articulated the appropriate *prima facie* elements to apply in cases outside of the traditional employment context. *Kinnon*, 490 F.3d at 889, 891, 893.

Those courts that have articulated such a *prima facie* test have had trouble distinguishing it from the elements of a Section 1981 cause of action. *E.g.*, *Brooks*, 365 F. Supp. 2d at 1353 (citing cases). Courts agree that the goal is to articulate a test that describes what evidence a plaintiff must produce to create a presumption of discrimination. *See id.* To this end, courts have consistently required Section 1981 plaintiffs to identify similarly situated persons outside of the plaintiffs' protected class(es) who were treated more favorably by the defendants. *Id.*; *Benton*, 230 F. Supp. 2d at 1370; *see also Kinnon*, 490 F.3d at 893; *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250,

---

[13]      Plaintiff has neither pled nor substantively argued a hostile work environment theory of discrimination under Section 1981; therefore, such theory will not be considered here.

1273 (11th Cir. 2004).[14]  This Court will look to the same factor in determining whether Plaintiff has presented evidence that raises a rebuttable presumption of discrimination.

**ii.      Application**

Plaintiff has argued that his contractual rights were impaired in at least four contexts: (1) package loading; (2) left-behind packages; (3) customer complaints; and (4) conversion of his route from a supplemental route to a primary service area.  (*See* Doc. Nos. 2, 68.)  The Court will consider whether Plaintiff has produced evidence of more favorably treated white comparators in each context.

In the context of package loading, Plaintiff testified that Mr. Dezelan "would not provide the assistance that I saw him providing other white contractors."  (Doc. No. 54-12 at p. 285.)  While all of the contractors had "issues with the loaders," Mr. Dezelan "made sure to do what he could with the white contractors."  (*Id.* at p. 307.)  Plaintiff specifically referred to Gerry Quick and Chris Wilson as white contractors whom Mr. Dezelan would help instead of Plaintiff.  (*Id.* at pp. 308-09.)  While Plaintiff was not present for the loading every single day, he stated: "I can account for the days that I witnessed myself and I saw a disparity in the way that my trucks were being loaded and I was being treated versus the other contractors."  (*Id.* at p. 311; *see also* Doc. No. 54-13 at pp. 135-43, 180-85, 189-93.)  Chris Wilson and Alex Rosario also testified that Plaintiff tended to have more loading problems than anyone else.  (Doc. No. 54-17 at pp. 35-38, 66-69, 93-97; Doc. No. 54-20 at

---

[14]      In the employment discrimination context, the Eleventh Circuit has explained the degree to which a comparator must be similarly situated: "The plaintiff and the [person] she identifies as a comparator must be similarly situated 'in all relevant respects.'  The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the [defendant]."  *Wilson*, 376 F.3d at 1091 (internal citation omitted).

pp. 65-73, 92-93, 95, 125-29, 145-49.)  This evidence raises a genuine issue of material fact that Plaintiff was subject to less favorable treatment by Mr. Dezelan in the loading process than white contractors.

Plaintiff also testified about a number of instances in which one of his drivers, Alex Rosario, was called back for a left-behind package by either Mr. Dezelan or Mr. Hinds.  (Doc. No. 54-13 at pp. 193-201.)  He indicated that other contractors' drivers would not be called back for packages. (*Id.* at p. 201.)  This was confirmed by another witness, Selena McNeely, an Administrative Assistant at the terminal, who testified during her deposition, "I witnessed [Plaintiff's] trucks not being loaded, I witnessed many packages not scanned to Mr. Munnings' truck being taken to him or his drivers being forced back to the terminal to pick them up."  (Doc. No. 54-16 at p. 53.)  Ms. McNeely further stated that this did not happen to other contractors and that there were too many mistakes being made to Plaintiff's loads for this to be accidental.  (*Id.* at pp. 63-65, 71-73.)  Mr. Rosario confirmed that he was called back for missed packages more than any other drivers.  (Doc. No. 54-20 at pp. 97, 121, 209-13.)  Such evidence raises a genuine issue of material fact as to whether Plaintiff was treated less favorably than white contractors by Mr. Dezelan and Mr. Hinds with respect to left-behind packages.

When asked if he knew of any specific white contractors who were more favorably treated regarding the classification of customer complaints by Mr. Dezelan, Plaintiff responded, "The majority of the contractors in the terminal."  (Doc. No. 54-12 at pp. 344-45.)  Specifically, Plaintiff named, "Tom George, King, I can't remember his first name, the Palm Bay drivers, I can't remember their last names, Gerry Quick, Jason, I can't remember his last name, Stindel, McCarry, Brotherton and I'm sure there are more that I can't recall at this time, that's what I can remember."  (*Id.* at p.

345.)  Since Plaintiff was able to identify particular white contractors who received customer complaints of a similar nature that were not converted into formal complaints by Mr. Dezelan, Plaintiff has raised a genuine issue of material fact on this matter.

Regarding route conversion, Plaintiff stated in his Affidavit that Mr. Dezelan was responsible for providing FedEx management with information and recommendations for route conversions. (Doc. No. 54-3 at pp. 2-3, ¶¶ 6-8; *see also* Doc. No. 54-12 at p. 191.)  Plaintiff testified in his deposition that several white contractors had their supplemental routes contracted while Plaintiff was waiting for his route to be contracted.  (Doc. No. 54-12 at pp. 236-37.)  Specifically, Plaintiff named Chris Wilson, Gerry Quick, Rich McCardy, Leonard Winn, and Gary Stindle.  (Doc. No. 54-13 at pp. 165-74.)  Plaintiff's perception was confirmed by the sworn statement of another witness, Thomas George, who stated:

> I heard Russ Dezelan . . . tell Mr. Munnings several times that Mr. Munnings' KSC/Cocoa Beach route would be the next route from our terminal to be split and contracted as two separate routes.  However, every time I heard Dezelan say that to Mr. Munnings, the route of a white contractor would be the next route from our terminal to be split and contracted as separate routes.

(Doc. No. 54-6 at p. 1, ¶ 3.)[15]  This evidence raises a genuine issue of material fact that Mr. Dezelan treated white contractors more favorably than Plaintiff in his recommendations of route conversions to FedEx management.

As previously explained, the Court may not weigh evidence or judge credibility when considering a Motion for Summary Judgment.  *Hairston*, 9 F.3d at 919.  Further, the Court must draw all reasonable inferences in favor of the non-moving party, Plaintiff.  *Anderson*, 477 U.S. at 255.  The majority of Defendant's arguments regarding Plaintiff's *prima facie* case involve the weight of the evidence, the credibility of witnesses, or the proper inferences to be drawn from the record.  (*See* Doc. No. 46 at pp. 20-24.)  These are not proper considerations at the summary judgment stage.  Plaintiff has produced evidence that raises a genuine issue of material fact as to whether he was treated less favorably than similarly situated white contractors.  This evidence, if believed by the jury at trial, would be sufficient to sustain a *prima facie* case of racial discrimination.

### d.      Legitimate, Nondiscriminatory Reason

Having determined that Plaintiff has presented triable issues of fact as to his *prima facie* case of discrimination, the Court next considers whether Defendant has met its burden of production to

---

[15]      Defendant objects to this paragraph as unreliable, speculative, conclusory, and containing hearsay.  (Doc. No. 60 at pp. 13-15.)  Defendant's arguments that Mr. George's statement is unreliable and conclusory goes to the weight, rather than the admissibility, of this evidence.  Defendant's claim that Mr. George's statement is speculative is overruled at this time, for Mr. George has sworn in his Affidavit that he has personal knowledge of the facts therein.  (Doc. No. 54-6 at p. 1, ¶ 1.)  The truth of this statement is an issue for trial.  Finally, the statements to which Mr. George refers are those of Mr. Dezelan in his capacity as terminal manager. Therefore, these statements are not hearsay but are instead admissions by a party-opponent under Federal Rule of Evidence 801(d)(2)(D).  Even if this were not the case, these statements are not offered for the truth of the matter asserted but instead for the fact of whether or not they were stated and thus do not constitute hearsay.

"articulate a legitimate, nondiscriminatory reason for the challenged . . . action." *E.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  This intermediate burden is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).

In its Motion for Summary Judgment, Defendant argues that it has asserted legitimate, nondiscriminatory reasons for every action challenged by Plaintiff:

> Specifically, the preload issues were the result of difficulties in retaining qualified loaders, a problem that was experienced by all contractors across the board, and about which FXG took action to correct.  Further, providing excellent customer service is among a FXG manager's most important responsibilities, and the company has an obligation to investigate and take action on valid customer complaints where appropriate.  Finally, all decisions regarding supplemental routes are based on route productivity, area growth and terminal package volume.  FXG and Dezelan followed the company's established approval process for having supplemental routes converted to primary service areas, and any statements by Dezelan regarding there being no guarantee that a route would be contracted by a particular date were accurate and do not reflect discriminatory or retaliatory animus.

(Doc. No. 46 at p. 25 (internal citations omitted).)  To support these claims, Defendant has included the sworn statements of Troy Hinds, Luke Anderson, and Doug Ferguson and excerpts from the depositions of Selena McNeely, Brian Shafranek, and Christopher Wilson.  (Doc. Nos. 47-3 to 47-8.)  Regarding the loading issues, Mr. Hinds, Mr. Anderson, Mr. Shafranek, and Mr. Wilson stated that problems with loading at the terminal were shared by all the contractors because there was frequent turnover in the loading staff.  (Doc. No. 47-3 at p. 5, ¶ 14; Doc. No. 47-4 at pp. 8-9, ¶ 26; Doc. No. 47-7 at pp. 10-11; Doc. No. 47-8 at pp. 5-8.)  Mr. Hinds also explained that packages could be left behind at the terminal for any number of reasons, including driver or loader error.  (Doc. No. 47-3 at p. 6, ¶ 15.)  As an example, Mr. Hinds stated that the addresses for the Kennedy Space Center were unusual and would confuse inexperienced loaders.  (*Id.* ¶ 16.)  Mr. Hinds also asserted that he never intentionally mishandled Plaintiff's packages.  (*Id.* at pp. 6-7, ¶ 17.)  Mr.

Bennington, a white male contractor, testified in his deposition that he too would occasionally get called back for left behind packages.  (Doc No 47-13 at pp. 5-7.)

Defendant also offered evidence that explains the customer complaint policy.  Mr. Anderson stated that all independent contractors are required to provide the highest level of customer service so that Defendant can remain competitive in the market.  (Doc. No. 47-4 at p. 2, ¶ 4.)  Defendant maintains a customer service department, which handles customer complaints, to ensure this expectation is met.  (*Id.* at pp. 2-3, ¶ 6.)  As Mr. Anderson explained:

> The terminal and its managers have no control over whether a customer call is converted to a formal customer complaint.  That is completely up to our customer service department in Pittsburgh, PA.  At the terminal, we receive electronic printouts of complaints that have already been received and processed by the customer service department, and marked as official complaints.  At that point, either the P&D manager, the senior manager, or the P&D service managers investigate the complaint by following up with the customer and meeting with the contractor and/or driver to obtain the necessary facts, and we then send the response to Corporate with our findings and recommendations with supporting documentation.

(*Id.*)  Thus, Mr. Anderson contends, Mr. Dezelan was not in a position to manufacture customer complaints against Plaintiff.  (*See id.*)

Additionally, Mr. Anderson explained that Mr. Dezelan was in charge of the investigation of very few of the complaints against Plaintiff.  Mr. Anderson detailed the complaints against Plaintiff and his drivers and stated, "According to our records, which always identify the specific manager who investigated the complaint, Dezelan only personally handled three of the many complaints and signature compliance violations brought to Munnings' attention."  (*Id.* at pp. 3-7, ¶¶ 8-23.)  Furthermore, "The independent contractor who purchased Munnings' proprietary interests in his routes, Stan Brotherton of The Stan Group LLC, has had similar problems with customer

complaints against his drivers, who are Munnings' old drivers.  Brotherton is a white male." (*Id.* at p. 7, ¶ 24.)

Also, Defendant has produced evidence that Plaintiff's route conversion was not delayed anymore than the normal time period.  For instance, Mr. Hinds stated that it could take years to get a supplemental route converted into a contracted primary service area. (Doc. No. 47-3 at p. 2, ¶ 4.) Mr. Hinds in fact attempted to get the supplemental route that Plaintiff purchased from him contracted before selling it but was unsuccessful. (*Id.*)  Mr. Anderson explained that the route conversion process depends on a number of factors and was subject to multiple layers of management approval. (Doc. No. 47-4 at pp. 10-11, ¶¶ 30, 32.) Mr. Ferguson further explained that during the time Plaintiff was seeking route conversion, the engineering department wanted to develop other areas.  (Doc. No. 47-5 at p. 3, ¶ 5.)  Additionally, according to Mr. Anderson, the package volume for Plaintiff's supplemental route was "significantly lower" than those on the routes that were selected for conversion earlier than his.  (Doc. no. 47-4 at pp. 11-12, ¶ 33.)  Plaintiff's supplemental route was eventually contracted as a primary service area in September of 2006.  (Doc. No. 47-4 at p. 11, ¶ 32; Doc. No. 47-5 at p. 2, ¶ 4.)

Finally, Defendant has produced evidence indicating that Mr. Dezelan was simply an unpleasant person who mismanaged the terminal and treated everyone equally poorly.  (Doc. No. 47-5 at pp. 3-4, ¶¶ 6-7; Doc. No. 47-6 at pp. 5-6; Doc. No. 47-7 at pp. 5-8; Doc. No. 47-8 at pp. 11-14.)    Thus, Defendant has met the burden of articulating legitimate, nondiscriminatory reason(s) for its challenged actions.

e.        **Pretext**

Since Defendant has met its intermediate burden, the burden of production shifts back to

Plaintiff to demonstrate that Defendant's articulated reasons for the adverse actions are merely

pretexts for unlawful discrimination.  *Holifield*, 115 F.3d at 1565.  This demonstration merges with

Plaintiff's ultimate burden of proving by a preponderance of the evidence that Defendant

intentionally discriminated against Plaintiff.  *Id.*  As the Eleventh Circuit has explained:

> If the defendant articulates one or more such reasons, the presumption of
> discrimination is eliminated and "the plaintiff has the opportunity to come forward
> with evidence, including the previously produced evidence establishing the prima
> facie case, sufficient to permit a reasonable factfinder to conclude that the reasons
> given by the [defendant] were not the real reasons for the adverse employment
> decision." . . .  If the plaintiff does not proffer sufficient evidence to create a genuine
> issue of material fact regarding whether each of the [defendant's] articulated reasons
> is pretextual, the [defendant] is entitled to summary judgment on the plaintiff's claim.

*Chapman*, 229 F.3d at 1024-25 (internal citations omitted).  In other words, a plaintiff must "come

forward with sufficient evidence to permit a reasonable factfinder to find that [the defendant's]

reasons were pretextual."  *Id.* at 1028.

In its Motion for Summary Judgment, Defendant argues:

> The only possible evidence that Munnings could offer to show pretext would be his
> allegations that Hinds made racial comments in his presence, and that Dezelan once
> allegedly referred to him as "you people, you blacks" during a heated argument. . .
> .  The isolated statements by Hinds, a non-managerial employee who was not
> involved in any decisions with respect to Munnings' contract, do not show the
> requisite discriminatory motivation. . . .  Nor can the admittedly isolated, stray
> remark by Dezelan support a pretext argument by Munnings, as it was unrelated to
> any adverse decision with regard to Munnings' contractual rights.

(Doc. No. 46 at pp. 25-26.)  Defendant here appears to invoke the stray remarks doctrine to support

its claim that Plaintiff has not raised a genuine issue of material fact of pretext.  (*See id.*)  This

doctrine holds that ambiguous, isolated stray remarks alone will not establish pretext.  *E.g.*, *Ash v.*

*Tyson Foods, Inc.*, 190 F. App'x 924, 926 (11th Cir. 2006).  However, stray racial remarks, in combination with other evidence, may constitute circumstantial evidence of discrimination.  *E.g.*, *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291-92 (11th Cir. 1998).

Plaintiff has introduced evidence that supports his claims that Mr. Dezelan and Mr. Hinds were motivated by racial animus and not Defendant's proffered legitimate, non-discriminatory reasons. As explained in detail in Section II.B.1.b, Plaintiff has produced evidence that he was treated less favorably than similarly situated white contractors.  While all contractors had loading problems, Plaintiff's loading problems were more severe.  (*E.g.*, Doc. No. 54-17 at pp. 35-38.) Plaintiff's drivers were called back to the terminal for left-behind packages more often than the other drivers.  (*E.g.*, Doc. No. 54-13 at pp. 193-201.)  Additionally, more of the customer complaints against Plaintiff were deemed formal customer complaints.  (*E.g.*, Doc. No. 54-12 at pp. 344-45.) Finally, Plaintiff's supplemental route conversion was delayed while white contractors' routes were converted, and Plaintiff has produced evidence that the package volume for his supplemental route was comparable to those of the routes selected for conversion.  (*E.g.*, Doc. No. 54-3 at pp. 14-35; Doc. No. 54-13 at pp. 166-74.)   This evidence shows that while Defendant's legitimate, nondiscriminatory reasons explain some of the problems faced by all contractors at the terminal, these reasons do not explain why Plaintiff's problems were more severe than those of white contractors as Plaintiff's evidence reflects.

 Also, Plaintiff has offered evidence that both Mr. Dezelan and Mr. Hinds demonstrated racially discriminatory behavior in the workplace while acting as employees of Defendant. According to Plaintiff's deposition testimony, Mr. Dezelan ignored Plaintiff in favor of white contractors and refused to shake Plaintiff's hand while never refusing to shake the hand of a white

person.  (Doc. No. 54-12 at pp. 254-263; Doc. No. 54-13 at pp. 95-97.)  Plaintiff also asserts that Mr. Dezelan sympathized with white people suffering family tragedies but did not do so with Plaintiff.  (Doc. No. 54-13 at pp. 113-18.)  Further, Mr. Dezelan talked down to Plaintiff, referring to Plaintiff and other black people derogatorily as "you blacks" and "you people."  (Doc. No. 54-12 at pp. 240-41, 267-68; Doc. No. 54-13 at pp. 99-101, 121-25, 298-99, 303-305.)  Plaintiff also detailed an incident in which Mr. Dezelan "suggested that if I was frustrated, that I pour diesel fuel over myself and light it" like a Middle Eastern man did at another terminal who was similarly frustrated with Mr. Dezelan.  (Doc. No. 54-13 at p. 299.)

In his deposition, Mr. Wilson, a white contractor, also testified that Mr. Dezelan treated Plaintiff differently than other contractors and spoke to Plaintiff in a particularly condescending tone.  (Doc. No. 54-17 at pp. 101-03.)  Plaintiff's driver, Alex Rosario, explained that while he was on a three-way telephone call with Mr. Dezelan and Plaintiff, Mr. Dezelan asked Plaintiff "why is it you people are always getting out of hand?"  (Doc. No. 54-20 at pp. 221-25.)  Furthermore, Mr. Shafranek, a white contractor, heard Mr. Dezelan use the word "nigger" while at work.  (Doc. No. 54-18 at p. 37.)  This evidence raises a genuine issue of material fact that racial animus motivated Mr. Dezelan's actions against Plaintiff.

Similarly, Plaintiff testified in his deposition that Mr. Hinds admitted to using the word "nigger" to Plaintiff when Plaintiff confronted Mr. Hinds in front of Mr. Dezelan.  (Doc. No. 54-13 at pp. 233-35.)  Mr. Shafranek testified that he heard Mr. Hinds say "nigger" quite frequently while Mr. Hinds was at the terminal working as Defendant's employee.  (Doc. No. 54-18 at pp. 61-63, 66, 74-75.)  This, along with Plaintiff's evidence suggesting that Mr. Hinds intentionally mishandled

Plaintiff's packages, raises a genuine issue of material fact that racial animus motivated Mr. Hind's actions against Plaintiff.

In modern society, race discrimination is often more subtle than overt, blatantly racist acts. As the United States Supreme Court stated in the context of school segregation: "[I]t must be acknowledged that the potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms . . . ." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992). Similarly, Justice Marshall wrote, "Today, although flagrant examples of intentional discrimination still exist, discrimination more often occurs 'on a more sophisticated and subtle level,' the effects of which are often as cruel and 'devastating as the most crude form of discrimination.'" *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 412 (1982) (Marshall, J., dissenting) (citing *Pennsylvania v. Local 542, Int'l Union of Operating Eng'rs*, 469 F. Supp. 329, 337 (E.D. Pa. 1978)); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 2003) ("Frequently, acts of discrimination may be hidden or subtle; an employer who intentionally discriminates is unlikely to leave a written record of his illegal motive, and may not tell anyone about it.").

Plaintiff has presented evidence suggesting, in part, a subtler and more sophisticated form of racial discrimination. Resolution of this case will require credibility determinations, decisions on disputed facts, and the weighing of conflicting evidence. Such considerations are the province of a jury and not a court considering a motion for summary judgment. *See Anderson*, 477 U.S. at 255. Since the evidence produced by Plaintiff raises a genuine issue of material fact that Defendant's legitimate, nondiscriminatory reasons for the challenged actions were pretext for racial discrimination, the Court must deny Defendant's Motion for Summary Judgment on Count I.

### C.      Count II: Retaliation

The Eleventh Circuit recognizes as cognizable retaliation claims under Section 1981. *E.g.*, *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998). The analysis for Section 1981 retaliation claims follows the same *McDonnell Douglas* burden-shifting framework used in Title VII claims. *E.g.*, *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 (11th Cir. 2008); *Vennett v. Gen. Elec. Co.*, No. 07-14364, 2008 WL 834456, at *5 (11th Cir. Mar. 31, 2008). First, a plaintiff must establish a *prima facie* case of retaliation by producing evidence that: (1) the plaintiff was engaged in statutorily protected conduct; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision. *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999). Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Farley*, 197 F.3d at 1336. If the employer meets its burden of production, then the burden shifts back to plaintiff to prove that the employer's proffered reason is merely pretext for unlawful retaliation. *Id.*

### 1.      Prima Facie Case

For purposes of its Motion for Summary Judgment only, Defendant does not challenge Plaintiff's ability to meet the first prong of the *prima facie* case, that Plaintiff engaged in protected activity. (Doc. No. 46 at p. 24.) However, Defendant denies that Plaintiff can prove the second and third prongs, that there was any adverse action suffered on account of the alleged retaliation and that there was a causal connection between the protected conduct and the adverse action. (*Id.*)

### a.      Protected Activity

Plaintiff claims that Defendant, through the actions of Mr. Dezelan,[16] retaliated against him

when he began complaining about racial discrimination in approximately mid-2006.[17]    In his

deposition, Plaintiff stated that he complained specifically to Doug Ferguson, an Assistant Managing

Director, and Vernon Jones, a Senior Manager in the Office of Contractor Relations.  (Doc. No. 54-

12 at pp. 251-52.)  Plaintiff spoke with Mr. Ferguson "several times on the phone" and met with him

in person in the "latter part of 2006."  (*Id.* at p. 253.)  He estimates that he spoke with Mr. Ferguson

about discrimination "in excess of ten times."  (*Id.* at p. 315-17.)  Similarly, Plaintiff had "in excess

of 30 conversations with Mr. Jones" about discrimination.  (*Id.* at pp. 281, 314-15.)  He could not

recall the exact dates of these conversations.  (*Id.* at p. 315.)  Plaintiff testified more generally that

whenever he complained to Mr. Ferguson or Mr. Jones about discrimination, Mr. Dezelan would

soon thereafter escalate his disparate treatment of Plaintiff.  (Doc. No. 54-13 at pp. 307-315.)  Such

testimony suggests that Plaintiff began making continuous complaints of discrimination around mid-

2006, and Defendant has offered no evidence or argument to the contrary.

### b.      Adverse Action

In making out a claim of retaliation, to establish that challenged conduct constitutes an

adverse action, a plaintiff must demonstrate that the action was materially adverse from the

---

[16]      In his Response, Plaintiff does not offer any argument that Mr. Hinds retaliated against him; therefore, the Court will only consider the actions of Mr. Dezelan in this Section.  (*See* Doc. No. 68 at pp. 16-17.)

[17]      The record is not clear as to when Plaintiff allegedly engaged in statutorily protected activity, that is, complained of racial discrimination.  In his Affidavit, Plaintiff suggests he first complained about such discrimination around the middle of 2006.  (Doc. No. 54-3 at p. 2, ¶ 5.)  The record evidence does not, however, reveal the exact number of times Plaintiff complained or the precise dates of these complaints.

standpoint of a reasonable person in the plaintiff's position.  *Davis*, 516 F.3d at 978 n. 52 (citing

*Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415-16 (2006)).  The

United States Supreme Court has explained that an action is "materially adverse" if it "well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Burlington N. & Sante Fe Ry. Co.*, 126 S.Ct. at 2415 (citation and quotation marks omitted).  This

legal standard is intentionally general "because the significance of any given act of retaliation will

often depend upon the particular circumstances.  Context matters."  *Id.*

      Plaintiff has produced evidence that Mr. Dezelan's actions against Plaintiff were materially

adverse.  For instance, in his deposition, Plaintiff testified:

> Q:     How do you feel you were retaliated against?
>
> A:     In the interference of my day-to-day operation, . . . in the attacking of my person, in the attacking of my drivers and the escalation of customer service calls that every other contractor receives on a daily basis to conversion of making them formal complaints.

(Doc. No. 54-12 at p. 339.)  Plaintiff further testified:

> Q:     How do you claim you were retaliated against by FedEx?
>
> A:     Russ Dezelan is FedEx.  Any action taken by Russ Dezelan, as far as I'm concerned, is an action taken against me by FedEx.
>
> Q:     What actions do you feel were retaliation?
>
> A:     The increase in problems with packages, the hesitance by FedEx to contract my routes, even though I was promised repeatedly that it would be the next to be contracted.  There are other things, at this time I just can't recall.

(Doc. No. 54-13 at pp. 305-07.)  Also, Plaintiff has offered evidence that during the 2006 peak

season in December, Mr. Dezelan pulled Plaintiff off Saturday deliveries and assigned those

deliveries to white contractors.  (Doc. No. 54-20 at pp. 185-87, 195-97.)  This evidence, if believed

by a jury, would constitute materially adverse actions against Plaintiff.

### c.      Causal Connection

To prove a causal connection, a plaintiff need only demonstrate "that the protected activity

and the adverse action were not *wholly unrelated*."  *Farley*, 197 F.3d at 1337 (citations omitted).

According to the Eleventh Circuit, "At a minimum, a plaintiff must generally establish that the

employer was actually aware of the protected expression at the time it took the adverse employment

action."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999).  This awareness

may be established either by direct or circumstantial evidence.  *Brown v. Metro. Atlanta Rapid

Transit Auth.*, No. 06-16434, 2008 WL 60279, at *6 (11th Cir. Jan. 7, 2008); *see also Bass*, 256 F.3d

at 1119 (stating that to establish a causal connection, the decision maker's awareness of the protected

activity might be established by circumstantial evidence, such as "close temporal proximity between

the protected activity and the adverse action"); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th

Cir.2004) ("[I]n the absence of other evidence tending to show causation" a party might establish

causation by showing a very close temporal proximity between the protected activity and the adverse

action).

Plaintiff testified in his deposition that he complained about Mr. Dezelan's racial

discrimination to Vernon Jones in the Department of Contractor Relations.  (Doc. No. 54-12 at pp.

251-53, 271-84, 307, 313-17; Doc. No. 54-13 at pp. 313-315.)  He also testified that he complained

to the regional manager, Doug Ferguson:

Q:      Is there a particular date or a particular time frame during which you feel that
        the issues with your packages increased?

A:      It's not just issue[s] with packages, it's overall complaints or the threats that complaints were becoming excessive, the threats that I wasn't servicing my routes the way that I should, in addition to the problems with being called back for packages.  Each time that I would make calls to Contractor Relations to complain about Dezelan, Contractor Relations would say that they would speak to him and that the instances should decrease, whereas they increased.  When speaking to the regional manager at the time, Doug Ferguson, about the issues with Dezelan and my concerns, he told me to go directly to Dezelan and let him know that I had spoken to [Ferguson] about these issues and even though I had done that, there was still escalation.  So each time that I made protest to someone other than Dezelan and it got back to him, he would increase his retaliation, his discrimination, all of his antics.

(Doc. No. 54-13 at pp. 307-09.)  A jury could infer from this testimony that there was a close temporal proximity between Plaintiff's complaints of discrimination and Mr. Dezelan's adverse actions against him.  (*Id.*)

Additionally, Plaintiff has stated under oath that the number of formal customer complaints charged against his drivers escalated dramatically after he began complaining of discrimination in mid-2006.  (Doc. No. 54-3 at p. 12, ¶ 41.)  Other employees also observed that towards the end of Plaintiff's time as a contractor with FedEx, Mr. Dezelan treated Plaintiff worse after Plaintiff made his complaints.  (Doc. No. 54-16 at p. 69; Doc. No. 54-17 at p. 66.)  Thus, Plaintiff has produced evidence that raises a genuine issue of material fact that Mr. Dezelan's adverse actions were causally connected to Plaintiff's complaints of discriminatory treatment.

## 2.      Legitimate Nondiscriminatory Reason and Pretext

Since Plaintiff has established genuine issues of material fact as to his *prima facie* case of retaliation, the Court next considers whether Defendant has met its burden of production to articulate a legitimate, non-retaliatory reason for its actions.  *See Farley*, 197 F.3d at 1336.  As explained in detail above, Defendant has produced evidence that the issues that Plaintiff faced were commonly shared among all contractors due to staffing shortages and general mismanagement.  *See* Section

II.B.2, *supra*. Therefore, the burden of production shifts back to Plaintiff to produce evidence raising a genuine issue of material fact that Defendant's articulated reasons were pretextual or unworthy of belief. *See Farley*, 197 F.3d at 1336.

As also discussed above, Plaintiff has produced evidence of pretext. *See* Section II.B.3, *supra*. Plaintiff testified that Mr. Dezelan's treatment of him worsened after he complained about Mr. Dezelan's discrimination. (*E.g.*, Doc. No. 54-13 at pp. 307-09.) Other employees noticed that Mr. Dezelan appeared to single Plaintiff out more frequently towards the end of Plaintiff's time as a contractor. (*E.g.*, Doc. No. 54-16 at p. 69; Doc. No. 54-17 at p. 66.) Defendant's legitimate, nondiscriminatory reasons do not explain this escalating disparate treatment. Therefore, Plaintiff has raised a genuine issue of material fact that Defendant's reasons are pretextual. Accordingly, the Court must deny Defendant's Motion for Summary Judgment on Count II.

### D.      Count IV: Breach of Implied Covenant of Good Faith and Fair Dealing

Under Florida law,[18] the implied covenant of good faith and fair dealing is a part of every contract. *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001). Rather than serving as an independent term within a contract, however, the covenant attaches to the performance of a specific contractual obligation. *Id.* Therefore, an action for breach of this covenant cannot be maintained in the absence of breach of an express contractual provision. *E.g.*, *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316-18 (11th Cir. 1999); *Ament v. One Las Olas,*

---

[18]      As the Court explained in its Order at Docket Number 91, both parties rely exclusively on Florida law to support their contractual arguments. (*See, e.g.*, Doc. No. 46 at pp. 26-28; Doc. No. 68 at p. 19.) Neither party mentions the choice of law provision in the Pick-Up and Delivery Contractor Operating Agreement calling for the application of Pennsylvania law. (Doc. No. 78-2 at p. 33; Doc. No. 79-2 at p. 32.) Since the Court has not been asked to enforce this provision, and both parties cite Florida law in their arguments, the Court will also apply Florida law.

*Ltd.*, 898 So. 2d 147, 149 (Fla. 4th DCA 2005) (quoting *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573, 575 (Fla. 4th DCA 1998)) ("a duty of good faith must relate to the performance of an express term of the contract").[19]

Defendant moves for Summary Judgment on Count IV of the Complaint, arguing that Plaintiff has not alleged that Defendant breached an express provision of the Contract. (Doc. No. 46 at pp. 27-28.)  Defendant argues:

> In this case, Munnings has not alleged–nor could he, given the undisputed record evidence–that FXG breached an express provision of the Agreement.  In fact, Munnings fails to identify any specific provision of the Contractor Operating Agreement in support of his claim.  Instead, Munnings identifies some abstract and independent obligation by FXG, claiming that it somehow failed to cooperate with Munnings in providing a standard of service that is fully competitive with that offered by other national participants in the industry, and failed to provide sufficient volume of packages to Munnings. . . .  Such abstract allegations do not support his claim.  *See Burger King Corp.*, 169 F.3d at 1316 (finding that "[w]ith respect to [a] breach of an implied duty of good faith, a duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.").

(*Id.* at p. 28.)  Defendant's reliance on *Burger King Corp.* is misplaced, however, because Plaintiff has alleged a breach of express contractual terms:

> However, since the inception of this action, Munnings's claim is based on the following express terms: first, that FXG failed to cooperate with Munnings in providing a standard of service that is fully competitive with that offered by other national participants in the industry; and, second, that FXG failed to provide sufficient volume of packages to Munnings to make full use of his equipment.

---

[19]     This standard is narrower than the one afforded by Section 1981(b) which applies more generally to impairment with "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

(Doc. No. 68 at p. 19.)  The relevant provisions of the contract are cited above in Section II.B.1.a.
Therefore, Defendant's arguments that Plaintiff has not *alleged* a breach of an express contractual
term fail.

Next, Defendant argues that "Munnings has no evidence to support [his claim] that
[Defendant] denied him a standard of service provided by others in the industry, and denied him [a]
sufficient volume of packages."  (Doc. No. 46 at p. 28.)  Plaintiff responds that he has produced
evidence of the loading problems which prevented Plaintiff from "meeting [Defendant's] loading
requirements" and "grow[ing] his business."  (Doc. No. 68 at p. 20.)  While this evidence shows that
Defendant may have interfered with Plaintiff's ability to meet his obligations under the contract and
maximize his benefits, it does not show a breach of the term indicating the parties will provide "a
standard of service that is fully competitive with that offered by other national participants in the
industry."  Furthermore, Plaintiff has not offered any evidence as to the *national* industry standard
with which the Court could compare Defendant's conduct.[20]  Finally, this contractual provision
relates to *customer* service and does not guarantee that Defendant will provide *Plaintiff* with a given
level of service.  (*See* Doc. No. 78-2 at p. 22; Doc. No. 79-2 at p. 21.)  Therefore, Plaintiff has failed
to establish breach of this contractual provision.

Plaintiff also states that "[a]mple evidence also shows that FXG failed to provide [a]
sufficient volume of packages to Munnings to make full use of his equipment."  (Doc. No. 68 at p.
20.)  While Plaintiff has offered evidence that his drivers were unable to *deliver* packages due to
loading issues or equipment failures, Plaintiff has not offered any evidence that he was provided an

---

[20]     While Plaintiff describes his perception of the local Orlando business practices of
DHL and UPS, Plaintiff has offered no evidence of the national industry standard.
(*See* Doc. No. 54-3 at p. 12, ¶ 42.)

inadequate *volume* of packages.  (*See id.* at p. 12, ¶ 19.)  Therefore, Plaintiff has also failed to establish breach of the second contractual provision.

Thus, Plaintiff, who bears the burden of proof, has not provided evidence raising a genuine issue of material fact to support a claim that Defendant breached the implied covenant of good faith and fair dealing.[21]  Therefore, Defendant is entitled to judgment as a matter of law, and the Court must grant Summary Judgment for Defendant on Count IV.

### Conclusion

Based on the foregoing, the it is **ORDERED** and **ADJUDGED** that:

1.    The Court **GRANTS IN PART AND DENIES IN PART** the Motion for Case-Dispositive Summary Judgment, Statement of Undisputed Material Facts, and Supporting Memorandum of Law by Defendant FedEx Ground Package System, Inc. (Doc. No. 46, filed Dec. 21, 2007).  Summary Judgment is **GRANTED** on Count IV and **DENIED** on Counts I and II.

2.    The Court **DENIES** the Motion to Strike and for Sanctions and Incorporated Memorandum of Law by Plaintiff Javano Munnings (Doc. No. 50, filed Jan. 15, 2008).

---

[21]    Plaintiff offers the deposition testimony of Vernon Jones in which Mr. Jones opined that if Mr. Dezelan acted in a racial discriminatory manner, such conduct would violate the terms of the operating agreement.  (Doc. No. 54-15 at p. 12; Doc. No. 68 at p. 20.)  However, Plaintiff has not identified any express contractual provision that prohibits racial discrimination.  (*See* Doc. No. 68 at pp. 19-20.)  Thus, Plaintiff's argument that Mr. Jones' opinion establishes breach of an express contractual term fails.

3.      Construing Plaintiff's Notice of Withdrawal of Two Claims as a Motion for Voluntary Dismissal of Two Claims, the Court **DISMISSES WITH PREJUDICE** Counts III and V of the Complaint (Doc. No. 52, filed Jan. 21, 2008).

4.      The Court **GRANTS IN PART AND DENIES IN PART** the Motion to Strike Affidavits and Other Evidence Filed in Opposition to Defendant's Motion for Case-Dispositive Summary Judgment and Supporting Memorandum of Law By Defendant (Doc. No. 60, filed Feb. 7, 2008).   The Court **GRANTS** the Motion as to the Affidavit of Gary Wolford and **DENIES** the rest of the Motion.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on April 22nd , 2008.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record